CLERK US DISTRICT COURT
ENTERED
MAR 12 2002
CENTRAL DISTRICT OF CALIFORNIA

FILED
CLERK US DISTRICT COURT
MAR 11 2002
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WATEC CO. LTD, a Japanese corporation,

Plaintiff(s),

vs.

CHIA C. LIU, a California resident, and WATEC COMPANY AMERICA, a Nevada corporation,

Defendant(s).

CV 00 - 10893 FMC (RNBx)

ORDER DENYING WATEC AMERICA'S MOTION FOR SUMMARY ADJUDICATION OF WATEC JAPAN'S CLAIMS

---

This matter is before the Court on (1) Plaintiff-Counterclaim Defendant's Watec Japan's Motion for summary judgment or, in the alternative, summary adjudication of Defendant-counterclaimant Watec America's counterclaims; (2) Defendant-counterclaimant Watec America's Motion for summary judgment of its counterclaims; and (3) Defendant Watec America's Motion for partial summary judgment of Plaintiff Watec Japan's claims.

The Court has considered the arguments raised in the parties' briefs and at oral argument held on March 4, 2002. For the reasons set forth below, the Court **DENIES** all three Motions for summary judgment or summary adjudication.

104

# I. Background

## A. Factual history

### *1. Watec Japan and NETCO*

Watec Co. Ltd ("Watec Japan") is a Japanese corporation with its principal place of business in Japan. In 1987 Shigemi Igarashi founded Watec Japan, which began designing, manufacturing, and selling Igarashi-designed Compact Charged Device ("CCD") cameras. Watec Japan was incorporated in Japan in 1987.

In late 1987 or early 1988, Watec Japan contacted Nippon Engineering Trading Co. (NETCO), an import/export trading company, to assist Watec Japan in selling its products. NETCO's principal and then vice president Soshi Yamaguchi was one of the main contacts at NETCO who communicated with Watec Japan. In late 1987 or 1988 NETCO entered into a business relationship with Watec Japan to sell Watec Japan-manufactured products worldwide. In the late 1980s and early 1990, Watec Japan and NETCO initiated efforts to sell Watec Japan cameras in the United States.

### *2. The establishment of Watec America, Corp.*

During a 1990 security trade show in Los Angeles, NETCO's Yamaguchi met with Chia Liu, a former college classmate of Yamaguchi's, to discuss NETCO's efforts to sell Watec Japan's CCD cameras in the United States. Liu resided in California, and Yamaguchi believed that Liu might be able to assist. After the 1990 trade show, Watec Japan and NETCO decided that they needed a base of operations in the United States to increase sales of cameras in North America. Yamaguchi contacted Liu about the possibility

of forming the contemplated American company. Watec Japan, NETCO and Liu subsequently entered into a business relationship to form an American corporation to distribute and sell cameras in North America. In June 1990, Watec America Corp. ("Watec America") was formed and incorporated in California, which was also the new corporation's principal place of business. Watec Japan took a 51% interest in Watec America, with NETCO getting a 34% interest and Liu a 15%. Watec America, however, had no written agreement among the three parties to accompany its establishment and operation.

*3. Watec America's business activities after establishment*

The parties agree that NETCO served as an intermediary between Watec Japan and Watec America. NETCO bought camera equipment and related supplies in Japan, paying Watec Japan in yen, and shipped and sold them to Watec America, which paid in dollars.

Watec America contends that Dr. Liu was the president of Watec America from its founding, hired the salesforce, ran the business, and dealt with customers. Watec America also claims that it marketed and sold the cameras in the U.S. and handled all warranty service on those cameras. Watec America asserts that after Watec Japan's initial investment in Watec America in 1990, Watec America paid for the advertising and promotion of the products in the U.S. for the balance of the next ten years. According to Watec America, Watec Japan paid only to send some of its employees to observe Watec America at various tradeshows.

Watec Japan, however, contends that Watec Japan was the majority stockholder in Watec America and Watec America was merely Watec Japan's distributor; therefore Liu's and Watec America's activities should be attributed to Watec Japan because he was acting as Watec Japan's agent.

From its inception until some time in 1999, Watec America sold Watec Japan-manufactured cameras and used Watec Japan packaging and billingual instruction manuals in the United States. Watec Japan contends that under the parties' distribution agreement, Watec America held a limited license to use the WATEC and WAT marks to sell Watec Japan-manufactured cameras in the U.S. Watec America, however, claims that no such limited license agreement existed.

Watec Japan also contends that under the parties' distribution agreement – which was an oral agreement, having never been memorialized in writing – Watec America was to sell exclusively Watec Japan-manufactured products. Watec America and Liu dispute that the parties reached any agreement regarding such exclusivity; they claim that Watec America was free to sell the products of whatever manufacturers they pleased.

*4. The WATEC and WAT marks*

Although it appears that since the late 1980s, Watec Japan distributed products and advertising bearing the WAT or WATEC marks in Japan and abroad, the parties dispute whether Watec Japan used either of those marks as a trademark on goods in the United States prior to the establishment of Watec America. Watec Japan claims it used the marks WATEC and WAT in the U.S. prior to the establishment of Watec America in June 1990. Specifically, Watec Japan maintains that it used the mark in direct mail advertising and at trade shows and even sold sample cameras bearing the marks to certain America companies. Because of this prior use, Watec Japan argues that it was and still is the rightful owner of the WATEC and WAT trademarks and that Watec America merely had a license to use the marks in the United States.

But Watec America claims that Watec Japan only sold cameras in the U.S. through NETCO bearing the brand names "Net" or "OEM." Watec America and Liu claim that Watec America's use of the marks WATEC and WAT was first suggested by NETCO in its role as intermediary between Watec Japan and Watec America. Liu also claims that he agreed to the use of those marks without any discussion or knowledge of any alleged prior usage made or claimed by Watec Japan.

Besides WATEC and WAT, Watec America also sold some cameras with the tradename Watec Co. Ltd., although Watec America claims to have sold only an insubstantial number of such cameras. In addition, Watec America acknowledges that a minority of the cameras it sold in the United States included instruction manuals carrying the tradename and address of Watec Co. Ltd, but claims that the insertion of Watec Co. Ltd in the manuals was done without Watec America's advance consent. Moreover, most of these instruction manuals also included Watec America's name and address. In addition to including the tradename and address of Watec Co. Ltd., these instructional manuals identified Watec Co. Ltd as the worldwide headquarters for WATEC branded cameras. Again, Watec America claims that Watec Japan inserted such information without its advance consent.

In 1992 and 1993, Watec America applied for federal registration of the trademarks WATEC and WAT; Liu provided a declaration in support of that application. With the applications for the marks, Watec America submitted a product information sheet for a WAT 801 camera, which contained a picture of a product with labeling of WATEC Co. Ltd. and contact information identifying WATEC Co. Ltd. as the worldwide headquarters for such products. The U.S. Patent and Trademark Office subsequently issued registrations to Watec America of the trademarks WATEC (in 1992) and WAT (in 1993).

Watec Japan claims not to have been aware of Liu's actions in registering the trademarks, and accuses Liu of fraud in obtaining trademarks for Watec America in which Watec Japan had a prior interest. The WATEC and WAT trademarks have since become incontestable, although Watec Japan maintains that it can still contest them because of fraud perpetrated by Liu in obtaining the trademarks. Watec Japan claims that it is the proper owner of those marks based upon its prior use of them, and contends that Liu knew of Watec Japan's rights to the common law trademarks in WATEC and WAT in the U.S at the time he sought to register the marks in Watec America's name.

Watec America and Liu deny all fraud allegations and claim that even if Watec Japan had previously used the WATEC and WAT brandnames on its cameras and products prior to the formation of Watec America, the registrations at issue are based on Watec America's continued use of those names in commerce and not on Watec Japan's de minimis previous use.

*6. Watec Japan and NETCO sell their interests in Watec America to Liu*

In 1995, Watec Japan and NETCO sold their shares of Watec America to Liu, who became Watec America's sole owner. As part of that Stock Purchase Agreement, Liu agreed to personally guarantee Watec America's payment of nearly $1,000,000 to NETCO that had accumulated as a result of currency fluctuations. Pursuant to that sale the parties entered into a Stock Purchase Agreement. Watec America claims that as part of that Stock Purchase Agreement, Watec Japan sold not only its stock in Watec America, but also any ownership interest in Watec America's related goodwill and trademarks. Watec Japan denies this, and contends that it sold only its stock in Watec America, and retained its ownership interest in the trademarks WATEC and WAT. Watec Japan claims that it held a common law

trademark in these marks based on its prior usage dating back to the late 1980s. It claims that Watec America had a license to use those marks pursuant to the distribution agreement, but denies that Watec America can rightfully assert any ownership interest in the marks. In response, Dr. Liu notes that he assumed approximately $1,000,000 worth of debt pursuant to the 1995 Stock Purchase Agreement and that other than its goodwill and trademarks, Watec America owned no assets at that time except for goods on hand and accounts receivable. Therefore, it can be inferred that the parties intended for Watec America to retain the rights to the WATEC and WAT marks in the United States.

*7. Watec America's sale of products not manufactured by Watec Japan*

Watec Amercia claims that Watec Japan was aware or should have been aware since at least 1995, that Watec America was selling goods which did not originate from Watec Japan. Watec Japan, however, claims that such sales were conducted under the parties' distribution agreement and differ in substance from Watec America's actions in 1999. In 1999, the parties had a major disagreement regarding Watec America's sale of cameras not manufactured by Watec Japan, but bearing the trademarks WATEC and WAT. Watec Japan demanded that Watec America cease further sale of the non-Watec Japan cameras because Watec Japan considered the sale of such cameras a violation of the parties' distribution agreement. Watec America refused to do so because it did not believe that any exclusive distributorship agreement existed between the parties that required Watec America to sell exclusively Watec Japan products. The two parties were unable to resolve their differences. As a result, Watec Japan ceased all sales of its cameras and related products to Watec America, because it felt that Watec America had breached the parties' distribution agreement.

Since that time, Watec America has continued to sell cameras not made by Watec Japan, in America under the WATEC and WAT trademarks.

*8. Genwac's formation*

In late 1999, after terminating its relationship with Watec America, Watec Japan formed a new company, Genwac, Inc. ("Genwac") to sell its products in North America. In January 2000, Genwac was incorporated in New York, which is also the corporation's principal place of operation. Genwac sells exclusively cameras designed, manufactured and sold by Watec Japan. In 2000, Watec Japan published an advisory notice from its president, Igarashi, advising the public of the termination of its relationship with Watec America and the establishment of Genwac to sell Watec Japan-manufactured products. The advisory notice stated that Watec Japan had terminated its business relationship with Watec America because the latter had committed serious violations of the parties' 1990 business agreement. It also notified potential customers that Watec Co. Ltd. no longer distributed its products through Watec America, but had instead established Genwac, a U.S. subsidiary, to distribute Watec Co. Ltd. products in North America.

Genwac sells its products under the GENWAC brand name and GW product prefix. It has not sold cameras bearing the marks WATEC and WAT. Watec America claims, however, that in its advertising, promotion, marketing, product materials and brochures, Genwac has identified itself and its products with the brands WATEC and WAT and has identified itself as the exclusive source of genuine WATEC and WAT cameras in the United States. Watec America also claims that Genwac has represented to the public that it sells products which are identical to those previously sold by Watec America under the WATEC and WAT marks and that Watec America

currently sells products under those marks that are unauthorized or counterfeit. In addition, Watec America asserts that Genwac employees have attended trade shows and otherwise contacted potential customers in order to apprise them that "Genwac" means "genuine Watec." Watec America also alleges that distributors have been confused by Genwac's representations as to the source of goods in the United States bearing the WATEC and WAT marks. For example, Genwac brand cameras contained model numbers identical to those of Watec America's cameras, except that the WAT prefix was replaced with GW. Watec America's entire line of cameras was in this way offered by Genwac. Watec America admits that Genwac does not use WATEC as a brand on its cameras, but claims that Genwac's intentional referencing of the WATEC name in its advertisements, letterhead, business cards, and tradeshow signs has created a strong connection between its products and the WATEC brand, thereby creating substantial consumer confusion. Watec America claims that as a result of Genwac's campaign of deliberate confusion, it suffered a decline in U.S. sales of approximately $600,000 due to loss of sales volume to certain distributors who have become Genwac distributors.

Watec Japan claims that Genwac has never represented to anybody that it is in any way affiliated with Watec America, but has utilized WATEC Co. Ltd., WATEC and WAT to describe its affiliation with Watec Japan and the origin of its products. It denies that distributors have been confused, and claims that distributors have purchased Genwac cameras because they are quality cameras manufactured by Watec Japan.

B. Procedural history

In October 2000, Watec Japan filed a Complaint, alleging the following causes of action against both Watec America and Liu:

(1) breach of contract;

(2) unfair competition (Cal. Bus. Code §17200);

(3) false advertising (Cal. Bus. Code §17500);

(4) violations of section 43(a) of the Lanham Act (15 U.S.C. §1125);

(5) defamation;

(6) intentional interference with prospective business advantage;

(7) declaratory relief; and

(8) trademark infringement.

Watec Japan bases its claims on, among other things, Watec America's and Liu's breach of the parties' alleged 1990 agreement regarding the exclusive distribution of Watec Japan products by Watec America in the United States.

In November 2000, Watec America and Liu responded by filing an Answer and asserting the following counterclaims against Watec Japan:

(1) trademark infringement;

(2) libel;

(3) unfair competition; and

(4) false advertising.

Watec America's and Liu's claims for trademark infringement, unfair competition, and false advertising are based on Watec Japan's and Genwac's use of the WATEC CO. LTD., WATEC, and WAT marks. Watec America and Liu also allege that the Watec Japan's 2000 advisory notice contains a libelous statement, i.e., that Liu breached an agreement between the parties.

There are three separate Motions for summary judgment or summary adjudication before the Court at this time.

First, Watec America has filed a Motion for summary adjudication of

Watec Japan's claims for breach of contract, unfair competition, false advertising, violations of section 43(a) of the Lanham Act, intentional interference with prospective business advantage, declaratory relief, and trademark infringement.

Second, Watec America has filed a Motion for summary judgment of its counterclaims for trademark infringement, libel, unfair competition, and false advertising.

Third, Watec Japan has filed a Motion for summary judgment of Watec America's counterclaims.

## II. Discussion

### A. Watec Japan's Claims

*(1) breach of contract*

In its moving papers Watec America asserts that all of Watec Japan's claims except defamation are based on the alleged WATEC and WAT trademark infringement. But Watec Japan disputes this assertion, and instead claims the breach of contract claim is based on Watec America's breach of the parties' distribution agreement. Watec Japan maintains that the distribution agreement required Watec America to sell exclusively Watec Japan cameras and related products in North America, and that Watec America violated the agreement by selling non-Watec Japan goods.

Because Watec America's Motion does not address the alleged breach of the distribution agreement in any depth, summary adjudication is

inappropriate.[1]

*(2) intentional interference with prospective business advantage*

As with the breach of contract claim, Watec America claims that in its moving papers that Watec Japan's intentional interference with prospective business advantage claim is based solely upon alleged trademark infringement, but Watec Japan contests this characterization. Instead, Watec Japan claims that Watec America represented to Watec Japan's customers that they should cease doing business with Watec Japan because it (Watec America) would put Watec Japan out of business. Watec Japan alleges that it has lost customers as a result of these representations.

Watec America's Motion for summary adjudication does not address this issue. Therefore, the Court cannot grant summary adjudication of Watec Japan's claim for intentional interference with prospective business advantage.[2]

*(3) The "Trademark claims"*

The parties agree that the following claims are all based on the same controversy surrounding the use of the WATEC and WAT trademarks: (a) unfair competition (Cal. Bus. Code §17200); (b) false advertising (Cal. Bus.

---

[1]Notably, Watec America's Reply brief is silent and thereby appears to concede that summary adjudication of the breach of contract claim is inappropriate.

[2] Watec America's Reply brief is silent and thereby appears to concede that summary adjudication of the intentional interference with prospective business advantage claim is inappropriate

Code §17500); (c) violations of section 43(a) of the Lanham Act (15 U.S.C. §1125); (d) trademark infringement, and (e) declaratory relief.

*A. Watec America's registration of the WATEC and WAT marks and subsequent acquisition of incontestable status for them.*

The Court's analysis begins by looking at Watec America's registration of the WATEC and WAT marks in 1992 and 1993 and subsequent acquisition of incontestable status for those marks.

*1. preliminary considerations*

Watec America contends that it conclusively owns the exclusive rights to the WATEC and WAT marks because it registered them with the Patent and Trademark Office and the marks are now incontestable. As a result of such ownership and exclusive right to use the marks, Watec America claims that it cannot possibly be liable for infringement of those marks.

It is undisputed that Watec America registered the WATEC mark with the Patent and Trademark Office in 1992 and the WAT mark in 1993. Pursuant to 15 U.S.C. §1065, these marks became incontestable after 5 years of continuous use by Watec America.[3] Incontestability is a type of quiet title

---

[3] Watec America and Liu also had to comply with 15 U.S.C. §1065(3), which provides that "(3) an affidavit is filed with the Director within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration

or statute of limitations; it provides the trademark registrant with significant protections, including a very strong presumption of legal ownership of the marks that can only be defeated on specific enumerated grounds. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985).

Section 15 U.S.C. §1115 provides many of the permissible grounds on which a trademark's incontestability can be legally challenged:

> (b) Incontestability; defenses
>
> To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce.
>
> Such conclusive evidence shall relate to the exclusive right to use the mark on or in connection with the goods or services specified in the affidavit filed under the provisions of section 1065 of this title, or in the renewal application filed under the provisions of section 1059 of this title if the goods or services specified in the renewal are fewer in number, subject to any conditions or limitations in the registration or in such affidavit or renewal application. Such conclusive evidence of the right to use the registered mark shall be subject to proof of infringement as defined in section 1114 of this title, and shall be subject to the following defenses or defects:
>
> (1) That the registration or the incontestable right to use the mark was obtained fraudulently; ...

---

on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce..."

It should be noted, however, that the enumerated defenses are not truly "defenses" as that term is often used in the context of affirmative defenses. In *Park 'N Fly*, the Supreme Court stated that:

> Representative Lanham made his remarks to clarify that the seven defenses enumerated in § 33 are not substantive rules of law which go to the validity or enforceability of an incontestable mark. 92 Cong.Rec. 7524 . Instead, the defenses affect the evidentiary status of registration where the owner claims the benefit of a mark's incontestable status. If one of the defenses is established, registration constitutes only prima facie and not conclusive evidence of the owner's right to exclusive use of the mark. Ibid. See also H.R.Conf.Rep. No. 2322, 79th Cong., 2d Sess., 6 .

*Id.* at 199 n.6 Therefore, even if Watec Japan could establish that Liu acted fraudulently in obtaining the federal registrations of the WATEC and WAT mark, it would not automatically forestall Watec America's claims for trademark infringement against it.

Moreover, in the context of Watec Japan's trademark infringement claims against Watec America, the defenses to incontestability laid out in section 1115(b) appear to be the wrong tool for the job at hand. With regard to Watec Japan's own claims (as opposed to Watec America's counterclaims), Watec Japan is not merely defending itself. It is asserting trademark infringement claims against Watec America, who holds the incontestable trademarks itself. In order to prevail on a trademark infringement claim against Watec America, Watec Japan would first need to have Watec America's incontestable trademarks cancelled under §1064 in order to possibly succeed on its infringement claims, because the fraud grounds laid out in §1115(b)(1) is only a "defense" to claim brought by a holder of an incontestable trademark. *See e.g. Hank Thorp, Inc. v. Minilite, Inc.*, 474

F.Supp. 228, 238 (D. Del. 1979). As long as Watec America holds the incontestable trademarks on the WAT and WATEC marks, Watec Japan cannot prevail on an infringement claim based on Watec Japan's purported ownership of those same marks. Under section 1115(b), Watec America's inconstestable registrations are "conclusive evidence" that it is the owner of the WATEC and WAT marks in the U.S. and has the "exclusive right to use the registered marks in commerce" here. Therefore, Watec Japan must first seek cancellation of Watec America's registrations.[4]

Despite Watec Japan's slightly roundabout manner of challenging the validity of Watec America's incontestable registrations in the WATEC and WAT marks, the Court notes that Watec Japan's Complaint's seventh cause of action for declaratory relief does ask for a judicial determination that Watec America's registrations are void and cancelled. And the arguments and evidence relating to fraud that Watec Japan presents in its Opposition to Watec America's Motion for summary judgment of Watec Japan's claims are equally relevant to the issue of cancelling Watec America's WAT and WATEC trademark registrations under section 1064(3). Moreover, "[w]hen an action involves a trademark registration, the district court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." *San Juan Products, Inc. v. San Juan Pools, Inc.*, 849 F.2d 468, 471-472 (10th Cir. 1988); *see* 15 U.S.C.

---

[4] Because "filing a fraudulent incontestability affidavit provides a basis for canceling the registration itself," any showing of fraud by Watec Japan would have the effect of cancelling the registration of the marks, and not merely destroying their incontestable nature and bringing the rebuttable presumption of section 1115(a) into effect.

§1119. Therefore, when deciding whether Watec America has shown that, as a matter of law, Watec Japan cannot prevail on its trademark infringement claims, the Court will consider Watec Japan's fraud allegations against Liu in the context of cancelling Watec America's registrations and thereby allowing Watec Japan to proceed with its infringement claims. *See Dymo Industries, Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) ("A registered trademark may be cancelled by direct attack as prescribed by the statute, and it may also be collaterally attacked in any action where the validity of the mark is properly in issue.").

2. *Failure to plead fraud in its complaint*

Watec America also contends that Watec Japan cannot now seek to invalidate Watec America's incontestable registrations of the WATEC and WAT trademarks based on Liu's fraud because Watec Japan failed to plead fraud either in its Complaint or under its affirmative defenses in response to Watec America's counterclaims, as is required by Fed. R. Civ. Proc. 8(c). Moreover, Watec America claims that under Fed. R. Civ. Proc. 9(b), all averments of fraud must not only be pleaded, but must be stated with particularly.

Watec America is correct that fraud in the procurement of a trademark registration must be pleaded with particularity. *See McCarthy* §31:84 ("In both the federal courts and in the Patent and Trademark Office administrative proceedings, fraud in the procurement of a trademark registration must be alleged according to the requirements of §9(b) of the Federal Rules of Civil Procedure."). A recent decision by the U.S. Patent and Trademark Office, Trademark Trial and Appeal Board demonstrates what such "particularility" means in practice:

When a party claims that the declaration in another's application for

> registration was executed fraudulently in that there was another use of the same or confusingly similar mark at the time the declaration was signed, the party must allege particular facts which, if proven, would establish that: (1) there was in fact another use of the same or a confusingly similar mark at the time the oath was signed; (2) the other user had legal rights superior to applicant's rights; (3) applicant knew that the other user had rights in the mark superior to applicant's, and either believed that a likelihood of confusion would result from applicant's use of its mark or had no reasonable basis for believing otherwise; and (4) applicant, in failing to disclose these facts to the Patent and Trademark Office, intended to procure a registration to which applicant was not entitled.

*Ohio State University v. Ohio University*, 51 U.S.P.Q.2d 1289, 1293 (Trademark Trial & App. Bd. 1999).

Watec America is correct that Watec Japan fails to make even conclusory allegations of fraud in its Complaint, let alone plead it with the sort of particularly required under the Federal Rules of Civil Procedure. Although the Complaint mentions Watec America's "efforts to obtain registration for the marks from the PTO" and asks for declaratory relief in the form of a cancellation of Watec America's registrations, absolutely no express or implied mention of fraud is made. Complaint at ¶54.

Nor does Watec Japan's Answer contain any averments of fraud. Although Watec Japan asserts twelve affirmative defenses, fraud is not one of them. Nor is fraud mentioned elsewhere in the Answer. The only averment possibly connected to fraud concerns "unclean hands," which is raised as the fourth affirmative defense. *See* Answer at p.7, ¶4. In cases dealing with trademark infringement, "Fraud in the procurement of a trademark registration may be raised ... as the basis for a defense of unclean hands..."

*McCarthy* §31:59. But Watec Japan's pleading of the affirmative defense of unclean hands cannot suffice to support a collateral attack on Watec America's registrations of the marks on the basis that the registration was fraudulently obtained. As previously stated, under Fed. R. Civ. Proc. 9(b) fraud must be pleaded with particularity, and courts have held parties challenging the validity of trademark registrations to very high pleading standards. *See Ohio State University v. Ohio University*, 51 U.S.P.Q.2d at 1293. Here, Watec Japan only makes the conclusory allegation that Watec America and Liu "are barred from maintaining the Counterclaim and each purported claim therein as a result of their unclean hands with respect to events which the Counterclaim and the claims alleged therein are based." This conclusory allegation cannot satisfy Fed. R. Civ. Proc. 9(b)'s requirement that fraud be stated with particularity.

As a result, the Court will not consider Watec Japan's challenge to Watec America's incontestable registrations of the WAT and WATEC trademarks on the basis that Liu and Watec America obtained those registrations fraudulently.[5] Watec Japan has not asserted any other challenges to the incontestability of Watec America's registration of the WATEC and WAT trademarks.[6]

---

[5]Because the Court concludes that Watec Japan cannot challenge Watec America's incontestable registrations based on its (Watec Japan's) failure to plead fraud with particularity, we need not reach the issue of whether Watec Japan is barred from challenging the registrations by the statute of limitations.

[6] Watec Japan cites to the Ninth Circuit's statement that in trademark disputes between manufacturers and distributors, "in the absence of an agreement between the parties, the manufacturer is presumed to own the trademark." *Sengoku*, 96 F.3d at 1220. Such a presumption

The Court finds therefore that Watec America holds valid, incontestable trademarks in the WATEC and WAT marks.

*3. Result of Incontestability*

Section 1065 provides in pertinent part that:

> *... except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration under this chapter of such registered mark*, the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has

---

(which may be rebutted in any event) is not, however, appropriate where the distributor has registered the trademarks in question and those trademarks have achieved incontestable status. In *Sengoku*, the distributor had registered the marks, but it appears virtually certain that the trademarks had not become incontestable. The *Sengoku* decision makes no mention of incontestability, and applies a standard for invalidating trademarks that is appropriate for marks that have been registered, but are not yet incontestable. *See id.* at 1219-1220

A trademark's achieving incontestable status changes the equation considerably. Whereas proof of registration of a mark only provides the registering party with rebuttable, prima facie evidence of ownership of that mark in an infringement action, if the mark has become incontestable then there is conclusive evidence of ownership. Shifting the rebuttable presumption from the registrant to the manufacturer makes sense when the mark has only been registered. But when the registered mark becomes incontestable, it provides conclusive evidence of the registrant's ownership, and the *Sengoku* presumption-shifting is inappropriate.

> been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable...

15 U.S.C. §1065 (emphasis added).

Watec Japan claims that it made such prior use of the WATEC and WAT marks before Watec America registered the marks in 1992 and 1993, indeed prior to the formation of Watec America in June 1990. If Watec Japan is correct, then it would retain the right to use the WATEC and WAT trademarks in the states where it used those marks prior to their registration by Watec America, so long as Watec Japan's use in those states was sufficient to establish its trademark rights under the applicable state trademark law. *See Casual Corner Associates v. Casual Stores of Nevada, Inc.*, 493 F.2d 709 (9th Cir. 1974); *Wrist-Rocket Mfg. Co. v. Saunders Archery Co.*, 578 F.2d 727, 731 (8th Cir. 1978); *Armand's Subway, Inc. v. Doctor's Associates, Inc.*, 604 F.2d 849, 850 (4thCir. 1979); *Advanced Stores Company, Inc. v. Refinishing Specialties, Inc.*, 948 F.Supp. 643, 650 (W.D. Ken. 1996). This reservation-of-common-law-trademarks concept is described at length by *McCarthy:*

> What if the federal registrant turns out to be, in fact, the junior user of the mark? That is, at trial, the non-registrant proves continuous use from a date prior to the registrant's first use...
>
> If the junior user's registration has become incontestable ... [t]he solution lies in the introductory clause of §15[7] which provides that incontestability is limited:
>
>> to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name

---

[7]Section 15 refers to 15 U.S.C. §1065.

> continuing from a date prior to the date of registration under this chapter of such registered mark, the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable...
>
> Proof by the senior user of the elements of this clause of §15 negates the incontestability as to the proven territory...
>
> Thus, §15 preserves, in a limited area, for the limited goods and services and for a limited time frame, the common law rights of the senrior user and prevents those rights from being totally cut off by a junior user's incontestable registration...
>
> .... The net result is that the extent of the senior user's territory is 'frozen' as of the date of the junior user's registration, analogous to the operation of §33(b)(5).
>
> Since §15 refers to the right acquired 'under the law of any state or Territory,' state law, not federal common law, applies to define the extent of the common law rights of the senior user.

*McCarthy* at §26:53.

If however, the senior and junior do not use their marks in geographically remote areas, the analysis changes considerably:

> If the senior user had used the mark nationwide prior to the junior user's first use, the 'remoteness' element is not met and the registration is not incontestable to any extent as against the senior user. Or, to track the exact words of §15, in such a case of nationwide use, the 'use' of the junior user's registered mark 'infringes' the senior user's 'valid right' nationwide.

*McCarthy* at §26:56.

Watec Japan claims that it used its marks in commerce prior to Watec America's registration of the marks. If Watec Japan can prove its claim, then the operative questions would become:

(1) In what states did Watec Japan use the WATEC and WAT marks in commerce? and

(2) Under the laws of those states, did such use vest Watec Japan with trademark rights in the states.

This focus on the states is necessary because "§15 refers to the right acquired 'under the law of any state or Territory,' [therefore] state law, not federal common law, applies to define the extent of the common law rights of the senior user." *McCarthy* at §26:53.

*4. Continuous Use of the WATEC and WAT marks?*

In order to avail itself of the §15 exception to incontestability, Watec Japan must show not only prior use, but also that its use of the marks has been continuous from before the registration up to the present. *See id.* at §26:54. "It should be noted that an important element of the § 15 exception is that the senior user's use must be continuous from before the registration up to the present. "Continuing" is not the same as a lack of abandonment: it means use without significant interruption." *Id.* at §26:55.

The Ninth Circuit's decision in *Casual Corner Associates v. Casual Stores of Nevada, Inc.*, 493 F.2d 709 (9th Cir. 1974) is illustrative of the point.[8] In

---

[8]*See also Wrist-Rocket Mfg. Co. v. Saunders Archery Co.*, 578 F.2d 727, 731 (8th Cir. 1978); *Armand's Subway, Inc. v. Doctor's Associates, Inc.*, 604 F.2d 849, 850 (4thCir. 1979); *Advanced*

*Casual Corner*, the plaintiff held an incontestable trademark in the "CASUAL CORNER" mark, but defendant claimed that its predecessors-in-interest had begun using CASUAL CORNER before the plaintiff's predecessors had registered the mark. The Court noted that "[t]he right of a registrant to use his mark becomes incontestable under 15 U.S.C. §1065 after five years of continuous use from the date it is registered, except to the extent that the use infringes upon a valid right acquired under state law by a use continuing from a date prior to the federal registration and publication." *Id.* at 711. But the Court also stated that in order for the defendant to establish that it had a valid right under state law acquired by a use continuing from a date prior to plaintiff's federal registration of the CASUAL CORNER mark, it had to "show (1) that its use of the mark began before its registration and publication in 1957 and (2) that there has been continuing use since that time... To be a continuing use, the use must be maintained without interruption." *Id.* at 712.

Ultimately, the Court of Appeals upheld the trial court's holding that defendant had not maintained a continuous use without interruption of the CASUAL CORNER mark because of its "complete nonuse of the mark for the one-year period between 1966 and 1967." *Id.* The Court rejected defendant's contention of "continuing use," within the meaning of 15 U.S.C. §1115, based on lack of intent to abandon. The Court explained:

> to argue that there is a continuing use unless the user has abandoned the mark creates a false issue. Section 1065 places upon a person claiming a prior state right the burden of showing that his has been a continuing use. To equate continuing with a failure to abandon would shift the burden from the state-right claimant to the owner of a valid

---

*Stores Company, Inc. v. Refinishing Specialties, Inc.*, 948 F.Supp. 643, 650 (W.D. Ken. 1996).

> and incontestable trademark. Such a result would be inconsistent with the statute and with the protection afforded by trademark laws. The [defendant's] failure to use the mark for the one-year period prevents it from claiming that it falls within the exception of section 1065 requiring a continuing use.

*Id.*

The Court cannot determine at this time whether Watec Japan can overcome the conclusive evidence of Watec America's ownership of the WATEC and WAT marks afforded by sections 1065 and 1115.

Watec Japan claims that it continually used the WAT and WATEC marks even after the formation of Watec America's and Liu's federal registration of the WAT and WATEC marks. It claims that it granted Watec America a limited license to use its marks and that Watec America's sale of goods with the WAT and WATEC trademarks throughout the parties' business relationship is therefore attributable to Watec Japan. Watec America strongly disputes that any such licensing agreement ever existed and claims that when it used the WAT and WATEC brands in commerce , it was using the federally registered trademarks and such use cannot be attributed to Watec Japan. As discussed in more detail below, because the parties' dispute over the existence of any licensing agreement presents genuine issues of material fact, the Court cannot settle their disagreement at the summary judgment stage. The trier of fact will have to determine who it believes in the "swearing contest" between the parties.

It appears to be undisputed that Watec Japan has used the marks in commerce since terminating its business relationship with Watec America in 1999. After terminating the relationship, Watec Japan set up Genwac, Inc. in January 2000 and has since been selling cameras under the GENWAC brandname and the GW product prefix; it has not sold cameras bearing the

marks WATEC or WAT. *See* Watec Japan's Statement of Uncontroverted Facts in Support of Motion for summary judgment of Watec America's counterclaims at ¶45 - 48. But, in advertising, promotion, marketing, and product materials and brochures, Genwac has identified its affiliation with Watec Japan by using the WATEC CO. LTD., WATEC, and WAT names to describe the origin and history of its Watec Japan-manufactured cameras. *See e.g.* Exhibits 301, 302, 303. And Watec America obviously believes that Watec Japan has continued to use the WATEC and WAT marks in commerce since 1999 - such continued use is the basis of their trademark-related counterclaims.

*B. Did Watec Japan use the WATEC and WAT marks prior to the establishment of Watec America in 1990?*

*1. The parties' positions and evidence*

Watec Japan claims it used the marks WATEC and WAT in the U.S. prior to the establishment of Watec America in June 1990. Specifically, Watec Japan maintains that it used the mark in the following ways:

(1) in direct mail advertising sent to prospective purchasers;

(2) at trade shows; and

(3) selling sample cameras bearing the marks to certain American companies.

Because of this prior use, Watec Japan argues that it was and still is the rightful owner of the WATEC and WAT trademarks and that Watec

America merely had a license to use the marks in the United States.

But Watec America claims that Watec Japan only sold cameras in the U.S. through NETCO bearing the brand names "Net" or "OEM." Watec America and Liu claim that Watec America's use of the marks WATEC and WAT was first suggested by NETCO in its role as intermediary between Watec Japan and Watec America. Liu also claims that he agreed to the use of those marks without any discussion or knowledge of any alleged prior usage made or claimed by Watec Japan.

First, the direct mail advertisements do not utilize the WATEC or WAT marks to sell the products. *See* Exhibit 74. Although the top of the advertisements bears the Watec Company Limited letterhead and logo, the body of the advertisement makes mention only of a "CCD VIDEO CAMERAS," "our latest models," or simply a "CAMERA." These advertisements do not even indicate that Watec Company Ltd. is offering cameras that it has manufactured itself, let alone that the cameras are sold under the WATEC or WAT mark. However, Watec president Igarashi states in his declaration that when Watec Japan originally sent out these letters, it also enclosed product pamphlets and price lists. As an example of such a pamphlet, Watec Japan provides the Court with Exhibit 80, which is a product brochure for a WAT-701 camera that Igarashi designed. That pamphlet identifies the featured cameras as the "WAT - 701 (EIA)" and "WAT - 701 (CCRI)." Watec Japan also claims that Exhibits 43-49 demonstrate that, prior to the formation of Watec America, American customers of Watec Japan referred to Watec Japan's marks WATEC and WAT. Watec Japan is correct; Exhibits 44 through 47 are letters sent by American customers to NETCO that expressly refer to the "WAT-902 Video Camera," "WAT - 904R cameras," "Watec 201 design," an "Model WAT-907 camera." These letters are all dated April or May 1990. And Exhibit 48

demonstrates that Watec Japan referred to a number of its cameras as "WAT-model number" (e.g. "WAT-902" or "WAT-801") in the invoices it sent in connection with cameras displayed at a camera trade show in Orlando in approximately March 1990. Igarashi also states in his Declaration that he viewed the cameras that were sent to the U.S. to be used in the Orlando and Los Angeles trade shows in Spring 1990 (prior to the formation of Watec America) and those cameras bore the WATEC or WAT marks.

On the other hand, the testimony of NETCO's Yamaguchi calls into question Watec Japan's claims that it was using the WAT and WATEC marks prior to the formation of Watec America. *See* Yamaguchi depo at 49-60. Yamaguchi initially claimed to have only sold Watec Japan products under the marks N.E.T or O.E.M. *See id.* at 49-50. But when confronted with copies of Exhibits 44-47, Yamaguchi changed his answer to state that he did not remember what under what brand name the cameras were sold to American customers prior to Watec America's formation, because brand name was not really important to him at the time and because eleven years had passed since the events in question. *See id.* at 56-65. Moreover, Yamaguchi noted that although Exhibit 48 shows that Watec Japan referred to its cameras by specific WAT-numbered names, he believed that originally the cameras were sold without the WAT or WATEC marks on them, and he could not remember when the WAT and WATEC marks were first placed on them. *See id.* at 70 -78. Moreover, he was not sure if the WATEC or WAT marks were used at all in connection with the Orlando and Los Angeles trade shows where NETCO and WATEC representatives rented booths in Spring 1990. *See id.*

In his Declaration, Dr. Liu states that he personally attended the Los Angeles trade shows where NETCO and Watec Japan had a booth and did not see any usage of either the WATEC or WAT marks on any cameras or

packaging there. He states that the cameras offered for sale were generically labeled CCD cameras, and that the cameras were offered for sale under the name NET, as NETCO was in charge of Watec Japan's marketing efforts in the U.S. at that time. In addition. Liu states that the first cameras supplied to him after the formation of Watec America were manufactured by Watec Japan but did not bear the WATEC or WAT marks on either the cameras or the packaging. Liu also claims that the marks were only affixed to the cameras and packaging after he (Liu) specifically requested it.

*2. Consideration of the evidence*

The determination of prior use of a mark presents a mixed question of law and fact. *See Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350, 355 (6th Cir. 1998). Whether or not a party's prior use of a mark was sufficient to establish ownership of the service mark is a question of law. *See id.*

Watec America contends that although the advertising, correspondence, or trade show flyers used by Watec Japan bearing the WAT or WATEC names might be sufficient to establish service mark rights, it is insufficient to establish trademark rights. In order to legally establish trademark rights, Watec America contends that Watec Japan must have placed the marks either on the cameras themselves or on the cameras' packaging.

Watec America is simply incorrect in its contention that physical affixation of the mark is necessary.[9] "While under traditional common law

---

[9]Watec America is correct, however, that Watec Japan's reliance on the holdings in *Allard* and *Nutri-System* is somewhat misplaced and disingenuous because those cases dealt with service

rules, priority of ownership of an inherently distinctive mark is determined by the first seller to *affix* the mark to goods and sell them, under §2(d) of the Lanham Act, the owner of a mark is the first to use the mark in any commercial usage, even if it is not affixed to the goods." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §16:22 (2001) (hereinafter *McCarthy*). Indeed under the Lanham Act, any of the following uses of a mark would be sufficient to obtain a federal registration of trademark:

(1) Placement of the mark on the goods in any manner;

(2) Placement of the mark on the containers and packaging of the goods;

(3) Placement of the mark on displays associated with goods or containers;

(4) Placement of the mark on tags or labels affixed to the goods or containers; or

(5) Placement of the mark on documents associated with the goods, if the nature of the goods makes any of the first four methods impractical.

*See id* at §16:27*;* 15 U.S.C. §1127. Moreover, the Trademark, Trade & Application Board has held that "an informational flyer or leaflet clearly depicting the mark and presented on the goods at trade show exhibits are acceptable displays associated with the goods" to justify registration of a mark under the Lanham Act." *In re Ancha Electronics, Inc.*, 1 U.S.P.Q. 2d 1318, 1320 (T.T.A.B. 1986). And in response to a series of federal district court decisions, the Patent and Trademark Office has taken the position that

---

marks, not trademarks, and the use standards for the two types of marks differ under 15 U.S.C. §1127.

it will accept a catalog or similar specimen as a "display associated with the goods" sufficient to justify federal trademark registration under certain circumstances that might be present in the instant case. *See* PTO Examination Guide No. 1-94, p.4 (January 28, 1994); Exhibit 80; *see also McCarthy* § 16:32.

Moreover, Watec Japan need not demonstrate that it used the marks in a manner sufficient to satisfy the Lanham Act's registration requirements in order for it to have used the marks sufficiently to obtain the common law trademarks in WATEC and WAT (which is what is really at issue here). This is important because the common law standards for what type of use suffices to create trademark rights appears to be significantly more liberal than the requirements of the Lanham Act. As described by the Restatement (Third) of Unfair Competition:

> Changes in commercial practices eventually made the requirement of physical affixation impractical. Designations adopted to indicate the source of services, for example, achieved protection at common law and under the federal trademark statute despite the impossibility of physical affixation. Modern marketing techniques also rendered the affixation requirement obsolete with respect to trademarks for goods. Use of a designation in the various advertising media can now establish the designation's significance as an identifying symbol as surely as its appearance on packaging or labels. Although physical affixation remains a common method of trademark use, the rule stated in this Section recognizes any manner of use that is sufficient to create an association between the designation and the user's goods or services.

Restatement (Third) of Unfair Competition at §18, comment d. (1995); *see also McCarthy* §16:24;

The contradictory testimony of Liu and Igarashi regarding the

placement of the WATEC and WAT marks on the cameras sold at the Los Angeles trade show creates a factual dispute as to whether those cameras actually bore the trademarks in question. And perhaps Yamaguchi's uncertainty regarding whether the marks were placed on the Watec Japan-manufactured cameras prior to the formation of Watec America, when contrasted with Igarashi's testimony, creates a triable issue of fact as well. But the uncontroverted evidence provided to the Court establishes that advertising which identified the cameras as the "WAT-701" model was sent to customers. And the customers' own correspondence to Yamaguchi demonstrates that in the customers' minds the cameras they were purchasing were designated by the "WAT" and "WATEC" marks, e.g. the "WAT-902 Video Camera," "WAT - 904R cameras," "Watec 201 design," an "Model WAT-907 camera." This correspondence is all dated April or May 1990 - prior to the formation of Watec America in June 1990. Given that the overriding purpose of trademark law is to prevent consumer confusion, the use of the WAT and WATEC marks by Watec Japan's and NETCO's *own customers* is particularly persuasive evidence that Watec Japan made use of those marks in commerce prior to the formation of Watec America. It demonstrates that consumers in the marketplace had made a conceptual association between the WAT and WATEC marks and the cameras and related products of Watec Japan.

Thus, it appears that Watec Japan presents a strong case for common law trademark rights that pre-date Watec America's registration of the marks. However, as discussed previously, any common law trademark rights that Watec Japan may assert in spite of Watec America's uncontestable registrations are based on state law, not federal common law. *See McCarthy* at §26:53 (" Since §15 refers to the right acquired 'under the law of any state or Territory,' state law, not federal common law, applies to define the extent

of the common law rights of the senior user."). And although Watec Japan's use of the WAT and WATEC marks prior to the formation of Watec America appears to be sufficient to vest in it federal common law trademark rights, the Court cannot reach the same conclusion with regard to state common law rights. Based on the evidence before the Court, it is not even clear in which states Watec Japan used the marks, let alone whether the quantum of use in particular states is sufficient to afford Watec Japan rights under the trademark laws of those states. Nor is it clear whether Watec Japan has used those marks continuously in the relevant states since its acquisition of any state common law trademark rights.

*C. Did Watec Japan relinquish any common law trademarks it held in WAT and WATEC after the formation of Watec America in June 1990?*

Watec America and Liu contend that even assuming that Watec Japan owned the common law trademarks WATEC and WAT due to its use of the marks in commerce prior to the formation of Watec America in June 1990, Watec Japan either (1) effectively transferred the trademarks to Watec America thereafter and/or (2) abandoned the trademarks by failing to continually use them.

Watec Japan denies having transferred its common law trademarks to Watec America. And Watec Japan claims that it continued to use its WATEC and WAT trademarks in commerce throughout the 1990s. It claims that pursuant to the distribution agreement between Watec Japan and Watec America, Watec Japan retained the trademarks and merely granted Watec America a limited license to use the trademarks in connection with selling Watec Japan-manufactured products in the U.S. Therefore, Watec

America's extensive use of the trademark from its formation in June 1990 until the disputes between the parties began in 1998 can be attributed to Watec Japan. Moreover, Watec Japan's Igarashi testified that Liu was told of Watec Japan's previous use of the WATEC and WAT marks in the U.S. prior to the formation of Watec America.

Watec Japan offers the testimony of its principal, Igarashi, in support of its contentions. Igarashi testified in his deposition that Liu acknowledged that Watec Japan had used the marks previously and that Watec America would have only a limited license to use Watec Japan's WAT and WATEC marks in the sale of Watec Japan products in the U.S. Watec Japan also provides the Declaration of Shoukichi Ishii, a special advisor to Watec who was present during meetings that Watec Japan had with Liu in mid-to-late 1990. Ishii states that Liu told him that Watec America and Watec Japan had entered into a distribution agreement under which Watec America would sell exclusively Watec Japan cameras in the U.S. *See* Ishii Declaration at ¶3.

Liu disputes Igarashi's testimony and claims that he (Liu) never knew that Watec Japan had used the WAT or WATEC marks prior to the formation of Watec America. Liu states that he never saw the marks placed on any of the Watec Japan-manufactured cameras or packaging until after he (Liu) suggested such affixation some time after Watec America was formed. Moreover, he vigorously disputes that the parties entered into any distribution agreement whereby Watec America was merely granted a limited license to use Watec Japan's WAT and WATEC trademarks. Liu claims that it was the parties' understanding that any previous efforts and goodwill accrued in the United States by Watec Japan's and NETCO's earlier attempts to sell cameras here were somehow "folded into" Watec America.

Because the parties inexplicably failed to memorialize any of their

agreements and understandings in writing, and because the parties' present testimony is so divergent and conflicting, the Court cannot determine at this time whether Watec Japan's interest in the common law trademarks for WATEC and WAT were merged into Watec America or whether Watec Japan retained exclusive ownership of those marks and only granted Watec America a limited license to use them. Watec Japan's evidence of an actual "meeting of the minds" regarding a licensing agreement whereby Watec Japan retained all common law trademarks rights to the WAT and WATEC marks appears to be very weak, but it is sufficient to create a triable issue of fact and preclude summary judgment.[10]

*D. Did Watec Japan transfer any common law trademark rights to WAT and*

---

[10]At oral argument, counsel for Watec America argued that any state common law rights that Watec Japan held prior to the formation of Watec America were "merged" into Watec America's registered trademarks. It appears that some courts have previously found such "merger" to occur. *See McCarthy* at §18:47; *Metro Traffic Control, Inc. v. Shadow Network, Inc.*, 104 F.3d 336 (Fed Cir. 1997). But the merger rule is inappropriate at the summary judgment stage where one party alleges that the parties had contractually agreed to a specific allocation of trademark rights which runs completely contrary to the merger rule. *See McCarthy* at §16:48. ("In manufacturer-dealer disputes, the courts generally presume that contractual provisions as to trademark ownership are determinative. That is, it would take a considerable weight of evidence of contrary customer perception ever to overcome the legitimate contractual expectations of the now-contesting parties. Thus, the first question to ask in a dispute is whether any agreement between the parties defines trademark ownership.").

*WATEC that it held as of 1995 under its sale of its interests in Watec America to Liu in the 1995 Stock Purchase Agreement?*

"When [trademark] disputes arise between a manufacturer and distributor, courts will look first to any agreement between the parties regarding trademark rights." *Sengoku Works Ltd. v. RMC International, Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996).

Watec America maintains that Watec Japan transferred any conceivable interest it had in the WATEC and WAT marks when it sold its interest in Watec America to Liu in the 1995 Stock Purchase Agreement. Watec America contends that because the Stock Purchase Agreement is a fully integrated agreement,[11] the parol evidence rule prevents Watec Japan from presenting any evidence indicating that there was a separate understanding regarding the assignment of trademarks.

Watec Japan, however, claims that the Stock Purchase Agreement only concerned the transfer of stock and did not address the assignment of the marks or the parties' standing distribution agreement. Watec Japan claims that at the time the Stock Purchase Agreement was signed, it owned the common law trademarks to the marks and the Stock Purchase Agreement's silence on the issue of ownership of the marks is evidence that the Stock Purchase Agreement did not transfer ownership of the marks to Watec America.

The Stock Purchase Agreement itself makes no express mention of the WATEC and WAT trademarks. It is itself entitled a "Stock Purchase Agreement" and no mention is made of the transfer of anything other than shares in Watec America Corp. Nonetheless, Watec America claims that the law provides that a business' good will, which includes its trademarks, passes

---

[11] *See* §13 of the Stock Purchase Agreement.

to the buyer along with ownership of the business, so no express assignment of the trademarks was necessary in the Stock Purchase Agreement.

Watec America is correct that "[i]f the good will of a business has been sold, the seller's later use of the trademark of that business is in derogation of the asset he has sold to another, and constitutes both trademark infringement and breach of contract." *McCarthy* §18:15. But it is not clear (1) whether Liu actually purchased Watec America's goodwill, and (2) whether the WAT and WATEC marks were the "trademarks" of the Watec America business or whether they remained the property of Watec Japan.

*1. The purchase of goodwill*

McCarthy states that under the traditional approach to determining whether good will is transferred:

> Since 'good will' is an intangible, evasive concept, under the traditional rule, courts will look to see where the tangible assets of a company went in order to determine whether an alleged 'assignee' of a mark in fact obtained the good will of the assignor. If an assignee buys a total business ... there seems little doubt that it has purchased the 'good will' of the seller." ... [However] "[i]f the 'assignee' buys *none* of the tangible assets of the assignor and the assignor continues to sell the same products under a different mark, this would tend to prove that the assignee received no good will at all."

*Id.* at §18:22. But courts have increasingly looked to factors other than the mere transfer of bits and pieces of tangible assets. Instead, courts are concerned with"protecting customers' legitimate expectations of continuity under the mark" *Id.* at §18:23. "[M]odern cases have begun to shift attention away from the formalities of the transaction and the location of tangible assets." *Id.* Instead, courts focus on whether the assignee

"continues to produce goods of the same quality and nature previously associated with the mark. But when the purported assignee does *not* make products of the same quality and nature as those made by the assignor, then the assignment is in gross and not effective to achieve priority." *Id.*

Here Liu and Watec America took title to the few tangible assets belonging to Watec America prior to Watec Japan's sale of its interest. *See* Liu Declaration at ¶20. Furthermore, Watec America continued to sell Watec Japan-manufactured products from 1995 until 1999. Such continuing sales of identical goods for four years after the Stock Purchase Agreement is compelling evidence that Liu purchased any goodwill that Watec Japan held in Watec America prior to the 1995 sale.[12]

*2. Ownership of the WATEC and WAT trademarks in the U.S.*

However, even if pursuant to the 1995 Stock Purchase Agreement Liu purchased all of Watec America's goodwill and any trademarks the company owned, it is not clear that Liu and Watec America actually purchased any state common law interest that Watec Japan held in the WATEC and WAT marks. As discussed in detail above, Watec Japan contends that it held the

---

[12]The fact that Watec America ceased selling Watec Japan-manufactured products in 1999 after the two parties got into a dispute should not change the good will determination. Watec Japan contends that Watec America started selling inferior products; Watec America disputes this contention and maintains that the non-Watec Japan-manufactured cameras and related products it sold were of equal quality). Four years had passed by that point and the determination of whether the goodwill was transferred cannot continue on forever.

common law trademarks and that from the beginning of the parties' relationship Watec America had only a limited license to use them in the U.S. If this is true, the common law trademarks were the goodwill of Watec Japan, which may have not been sold in the 1995 Stock Purchase Agreement. Liu and Watec America could validly claim that the Stock Purchase Agreement gave them full ownership of the federally registered Watec America trademarks, but not necessarily the common law trademarks.

Watec America also argues that because Watec Japan knew that Watec America had registered the WATEC and WAT trademarks, the Stock Purchase Agreement's silence regarding any retention of common law trademarks is clear evidence that Watec Japan voluntarily dropped any claims it might have had. Because the Stock Purchase Agreement makes no mention of trademarks, and because Watec Japan knew that the trademarks were registered in Watec America's name, it is clear that Watec Japan recognized that by selling its Watec America shares to Liu it was making an implied assignment of any common law trademarks it still held. Liu also contends that the sale must have included any remaining claims Watec Japan held to the common law trademarks because he paid about $30,000 for the stock and personally guaranteed that Watec America would pay nearly $1,000,000 to NETCO to cover a substantial currency exchange debt. Since very few tangible assets were involved, both the goodwill and trademarks must have been involved. Liu testifies that he never would have agreed to the 1995 Stock Purchase Agreement if the trademarks and goodwill had not been included in the deal. *See* Liu Declaration at ¶21.

The Court cannot conclude as a matter of law that the Stock Purchase Agreement's silence signified Watec Japan's implied assignment of any common law trademarks it still held. Given the Stock Purhcase Agreement's silence on the subject, it is possible that (1) Watec Japan

transferred any interest it might have formerly held, as 51% shareholder, in the federally registered WATEC and WAT trademarks, which were in Watec America's name, but (2) kept any common law trademarks it held in WATEC and WAT. The facts surrounding this case strongly suggest that such a bifurcated arrangement was unlikely. Liu's personal guarantee that Watec America would pay $1 million to NETCO to cover previous currency exchange shortfalls, coupled with the fact that Watec America possessed few tangible assets besides its goodwill and its federally registered WAT and WATEC trademarks, suggests that Watec America purchased any residual state common law trademark rights held by Watec Japan. But Watec Japan has offered enough evidence (testimony regarding the parties' alleged distribution agreement and limited licensing agreement) to create a triable issue of fact that precludes summary judgment.

*D. Watec America's Defenses of Laches and Judicial Estoppel*

Watec Japan claims that Watec America cannot assert these equitable defenses because it failed to plead them in its Answer to Watec Japan's Complaint. Federal Rule of Civil Procedure 8(c) requires that parties affirmatively plead both estoppel and laches in their Answer. *See* Fed. R. Civ. Proc. 8(c). Strangely, in its Reply brief, Watec America does not contest Watec Japan's contention that Watec America failed to properly plead these affirmative defenses. Watec America's silence is strange because an examination of Watec America's Answer reveals that although it failed to plead laches, it did state under its "Affirmative Defenses" section that Watec Japan was "equitably estopped" from asserting any claims against it. Therefore, the judicial estoppel defense does appear to be before the Court.

Because there remain many factual disputes between the parties and it is not yet clear in whose favor the equities tilt, the Court declines to find as a matter of law that Watec Japan is judicially estopped from asserting its trademark infringement claims against Watec America and Liu. The Court will, however, consider applying judicial estoppel in the future if such application is appropriate.

*E. Conclusion*

Summary adjudication of Watec Japan's "trademark claims" is inappropriate at this time because there are a number of bona fide disputes of material of fact that cannot be resolved at the summary judgment stage.

## III. Conclusion

The Court hereby denies Defendant Watec America's Motion for summary adjudication of Plaintiff Watec Japan's claims.

**B. Watec America's and Liu's Counterclaims against Watec Japan**

***(1) Counterclaims for trademark infringement, unfair competition, and false advertising***

*A. Background*

Watec America's "trademark counterclaims"[13] against Watec Japan are based on Watec Japan's extensive attempts to use advertising and marketing to create a clear and strong connection between the WATEC name and brand and the Genwac brand cameras that Watec Japan now sells in the United States. For example, flyers for the GENWAC cameras contain phrases such as "Same Quality Watec Cameras, Lower Pricing" and a Genwac catalog uses the phrase "Watec/GENWAC" to refer to themselves.

Watec America claims that Watec Japan's and Genwac's repeated attempts to create a strong connection between the Genwac brand cameras and the WAT and WATEC marks constitutes trademark infringement because it creates substantial confusion among customers as to the source of the goods in question. Watec America claims that it holds the incontestable rights in the WAT and WATEC marks and that Watec Japan's and Genwac's attempts to connect their products to the Watec name is done intentionally with the aim of creating customer confusion and profiting off of the WATEC and WAT marks to which it possesses no legal right. As a result of the diversion of customers to Genwac, Watec America claims that it lost about $600,000 in sales in the United States for the year 2000, the first full year of

---

[13]As was the case with Watec Japan's claims, the parties agree that all three of these counterclaims are based on the same controversy surrounding the use of the WATEC and WAT trademarks

Genwac's operation.

*B. Watec America's Motion for summary adjudication of its trademark counterclaims*

As discussed at length previously in the sections of this Order concerning Watec Japan's trademark claims, there are a number of triable issues of material fact that preclude the Court from determining the extent of the parties' ownership of the federal and state trademark rights to the WAT and WATEC marks. Because Watec America's trademark counterclaims rise or fall based on the final determination of those disputed trademark rights, summary adjudication in favor of Watec America on their trademark counterclaims is inappropriate at this time.

*C. Watec Japan's Motion for summary adjudication of Watec America's trademark counterclaims*

Watec Japan's Motion for summary adjudication of Watec America's trademark counterclaims, insofar as the Motion is brought on the basis that Watec Japan cannot be guilty of infringing the WATEC and WAT marks that it legally owns, must also be denied because of those same triable issues of material fact.

However, Watec Japan raises a number of additional, non-ownership-of-the-marks-related defenses to the trademark counterclaims that merit discussion.

*(1) Watec America's proof of damages*[14]

Watec Japan maintains that summary adjudication of Watec America's and Liu's counterclaims for trademark infringement, unfair competition, and false advertising is appropriate because Watec America cannot prove its damages. First, Watec Japan claims that Watec America unjustifiably assumes that its entire decline in sales in the year 2000 was caused by Watec Japan's and Genwac's alleged misconduct, when in reality a number of other factors could have caused all or at least substantial parts of that decline. Second, Watec America has not designated a damage expert to identify and calculate its claimed damages. And although Watec Japan propounded discovery in order to ascertain Watec America's claimed damages, Watec America has not provided documents or a report detailing its theory and justifying its claimed amount of damages. Finally, Watec Japan claims that Watec America has not provided competent evidence that it lost even one customer because of Watec Japan's and Genwac's alleged wrongful conduct.

In response, Watec America maintains that Liu has repeatedly stated (at his deposition, in an answer to written interrogatories, in declarations attached to other motions before this court, etc.) that Watec America suffered $600,000 in damages as a result of lost sales in the United States in the year 2000, the first year of operation for Genwac. Watec America claims that it has provided Watec Japan with an itemized identification of its losses,

---

[14]As noted by Watec America in its Opposition to Watec Japan's Motion for summary judgment of the counterclaims, Watec Japan's failure-to-prove-damages argument does not go to issue of whether Watec Japan could still be liable for injunctive relief based on Watec America's trademark counterclaims.

and that the $600,000 figure is based upon the business that Watec America lost to Genwac when former Watec America customers switched all or a substantial portion of their business to Genwac after its formation in early 2000. Watec America contends that it had increasing sales prior to the year 2000, but then experienced a major downturn in sales in the U.S. due to the diversion of customers to Genwac, who advertised that they sold "WATEC cameras at Genwac prices."

"In determining the standard of proof for fact and amount of plaintiff's damages in trademark litigation the courts have looked to the law laid down in damage actions under the federal antitrust law." *Id.* at §30:76. In the antitrust context, the U.S. Supreme Court has stated that the plaintiff's "burden of proving the fact of damage ... is satisfied by its proof of some damage flowing from the unlawful [conduct]; inquiry beyond this minimum point goes only to the amount and not the fact of damage. It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury..." *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 114 n.9 (1969). And in the context of trademark infringement cases, McCarthy states:

> While the plaintiff must prove causation, it does not have to negate every conceivable intervening factor which might have caused a decline in sales. Plaintiff need only make a prima facie showing of reasonably forecast profits, whereupon defendant has the burden of proving, if it can, that plaintiff's losses were caused by something other than defendant's own wrongful conduct.

*McCarthy* at §30:79; *see also Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993) ("To establish damages under the lost profits method, a plaintiff must make a 'prima facie showing of reasonably forecast profits.'")

(quoting *McCarthy*). Under this relatively liberal standard, Watec America has at least created a triable issue of fact as to whether Watec Japan's alleged trademark infringement, false advertising, and unfair competition caused it some damage.

With regard to Watec America's proving the amount of its damages, 15 U.S.C. §1117 provides that trademark plaintiffs showing infringement may:

> recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.

15 U.S.C. §1117. "Damages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement. Because proof of actual damages is often difficult, a court may award damages based on defendant's profits on the theory of unjust enrichment." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993). In situations in which the parties are direct competitors, however, a plaintiff generally cannot recover both (1) defendant's profits and (2) damages, because such recovery would risk overcompensation. *See McCarthy* at §30:74. The Ninth Circuit has noted that "'[d]amages are not rendered uncertain because they cannot be

calculated with absolute exactness,' yet, a reasonable basis for computation must exist" and damages may not be merely "speculative" or "remote." *Lindy Pen*, 982 F.2d at 1407-08 (quoting *Eastman Kodak Co v. Southern Photo Materials Co.*, 273 U.S. 359 (1927).

With regard to damages based on lost profits, the evidence provided by Watec America is as follows. In his deposition, Liu remarks that Watec America suffered a $600,000 drop in sales in the year 2000. He attributes this entire loss to the diversion of ex-Watec America customers to Genwac. In support of this attribution, Watec America points to Sealed Exhibit 1,[15] a spreadsheet obtained through discovery from Genwac that shows the names of Genwac customers and the amount of Genwac sales made to those customers. Many of these customers are identified by Liu as (1) ex-customers of Watec America who have apparently switched to purchasing cameras and related products from Genwac, and (2) distributors who still purchase some goods from Watec America but whose total purchases from Watec America have declined as they have transferred a portion of their business to Genwac. Although it appears that Watec America's line of reasoning, i.e. that some of if not all of its decline in sales can be attributed to

---

[15]Watec Japan claims that Sealed Exhibit 1 and Exhibit 2 have not been authenticated, and that Watec America's lawyer, Mr. Dawes, cannot authenticate them because he is not a Genwac employee. Watec Japan's claim is puzzling, because these very documents were provided to Watec America by Watec Japan and Genwac in response to discovery requests. If any of the information in Exhibits 1 and 2 is incorrect, it is the fault of Watec Japan and Genwac and it is their responsibility to explain any inaccuracies. Notably missing from Watec Japan's and Genwac's objections to Watec America's reliance on Exhibits 1 and 2 is any indication that any information in the Exhibits is, in fact, incorrect or deserves further explanation.

Genwac's entrance in the marketplace, is reasonable, Watec America has not shown that its lost market share has resulted because of customer confusion stemming from Watec Japan's and Genwac's alleged wrongful use of the WAT and WATEC marks in commerce or in their advertisements and correspondence. Just because customers have switched from Watec America to Genwac does not automatically mean that their switch was in some way caused by Genwac's liberal usage of the WATEC and WAT marks in its advertisements and correspondence with potential customers. And for a plaintiff to recover damages based on lost sales under the Lanham Act, most courts "require proof that some consumers were actually confused or deceived," *McCarthy* at §30:73, although some courts will presume customer confusion where the defendant's actions were intentionally deceptive. *See e.g. Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481 (2d. Cir. 1998); *see also* Restatement (Third) of Unfair Compeition at §36, comment j (1995). Watec America has provided no admissible evidence of actual confusion. They have provided a two-line conclusory statement from Liu that "There is continual actual confusion in the marketplace between Watec America and its products and those of Genwac, Inc", and the inadmissible hearsay testimony of James A. Capps and Erik Dzielski.[16] On the other hand, Watec Japan itself has already admitted that there is actual confusion in the market as to the ownership of the marks. In its Opposition to Watec America's Motion for summary adjudication of its claims, Watec

---

[16]Both Capps and Dzielski testify that although they know the difference between Watec America and Genwac/Watec Japan, their customers are confused. Such testimony is classic hearsay, as it is offered for the truth of the matter (that their customers were indeed actually confused as to the source of products and the ownership of the marks).

Japan stated "*the fact* that Watec America's infringement of the marks has caused confusion in the market concerning ownership of the marks..." (Opp. at 14:17-19) (emphasis added). Under these circumstances, it seems that there remains at least a triable issue of fact regarding whether customers have been confused as to the ownership of the WAT and WATEC marks and whether as a result of such confusion Watec America has lost actual sales. Moreover, actual confusion has been presumed by some courts when the defendant's actions were intentionally deceptive, and in the instant case there is also at least a triable issue of fact regarding whether Watec Japan's and Genwac's actions were intentionally deceptive.[17]

---

[17]Furthermore, a recent Ninth Circuit decision strongly suggests that this Court should not foreclose the possibility of Watec America recovering damages at this stage in the proceedings:

> although the Ninth Circuit in Harper House stated that "actual evidence of some injury resulting from the deception is an essential element" in a suit for damages under § 43(a), id. (emphasis omitted), a more recent decision holds that "an inability to show actual damages does not alone preclude a recovery under section 1117." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1411 (9th Cir.1993) (quoting *Bandag, Inc. v. Bolser's Tire Stores*, 750 F.2d 903, 919 (Fed.Cir.1984)). Under *Lindy Pen*, the preferred approach allows the district court in its discretion to fashion relief, including monetary relief, based on the totality of the circumstances. Id.; see also *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157 (7th Cir.1994) (stating that, even if a plaintiff is unable to demonstrate damages resulting from the defendant's § 43(a) violation, § 1117 allows the district court to award the plaintiff any just monetary award so long as it constitutes "compensation" for the plaintiff's losses or the defendant's unjust enrichment and is not simply a "penalty" for the defendant's conduct).

Finally, Section 1117 of the Lanham Act allows trademark plaintiffs to recover either damages or, alternatively, defendant's profits. And Watec America's Opposition brief suggests that they may seek defendant's profits, rather than their own damages, at trial.[18] Watec Japan has not contended that either its or Genwac's profits are somehow unascertainable. In fact, Watec America has provided such proof of Genwac's sales. *See* Sealed Exhibits 1 and 2. Accordingly, if determining Watec America's damages becomes too complex or onerous, then Watec America could simply seek recovery of Watec Japan's and Genwac's profits. "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. §1117.[19] Under this approach, Watec America's burden of production would be extremely light, and the onus would be on Watec Japan to make a detailed showing of costs and deductions. *See McCarthy* at §30:66 ("Thus, the plaintiff need only prove gross sales and it is then the infringer's burden to prove (1) which, if any, of those sales were not attributable to the wrongful act, and (2) deductible costs and expenses to arrive at net profits... Any doubts about the

---

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134,1146 (9th Cir. 1997).

[18]At page 4 of its Opposition, Watec America notes that 15 U.S.C. §1117(a) of the Lanham Act provides that in "... assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed ..."

[19]15 U.S.C. §1117 also provides that "[i]f the court shall find that the amount of recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." In this case, Watec Japan sells its cameras worldwide and an award of all its profits from all of its worldwide sales would appear to be excessive.

actual amount of gross sales or profits will be resolved against the infringing party."). In addition, a number of the Circuits have held that a Lanham Act plaintiff need not demonstrate either actual confusion or actual damages in order to obtain an infringer's profits. *See Maier Brewing Co. v. Fleischmann Distilling* Corp., 390 F.2d 117, 123 (9th Cir. 1968); *Burger King Corp. v. Mason*, 855 F.2d 779 (11th Cir. 1988); *Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202 (7th Cir. 1990); *Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595 (6th Cir. 1991). And although most courts "almost always require that defendant's infringement imply some connotation of 'intent,' or a knowing act denoting an intent, to infringe or reap the harvest of another's mark and advertising" when trademark plaintiffs seek the defendant's profits, *McCarthy* at §30:62; *see also Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405-06 (9th Cir. 1993), Watec America has at least created a triable issue of fact regarding Watec Japan's and Genwac's harboring such a wrongful intent through its continued use of the WATEC and WAT marks in its advertising and correspondence sent to potential customers.

Accordingly, the Court denies Watec Japan's and Genwac's Motion for summary adjudication of Watec America's trademark claims based on their alleged failure to prove damages.

*(2) Watec Japan's affirmative defenses of laches by acquiescence, estoppel, and waiver*

Watec Japan maintains that Watec America's trademark counterclaims are barred by laches by acquiescence, equitable estoppel, and waiver. Watec Japan argues that waiver, laches by acquiescence, and equitable estoppel apply because Watec America assured Watec Japan that it would not assert its trademark rights against Watec Japan, and Watec Japan relied on this representation to its disadvantage. Watec Japan asserts that the following acts demonstrate that Watec America acquiesced in Watec Japan's use of the WAT and WATEC marks:

(1) Watec America placed Watec Japan's name on packaging, advertising, and related promotional materials throughout their business relationship that spanned from 1990 until 1999;

(2) Watec America submitted exemplars to the Patent and Trademark Office representing that Watec Japan was the manufacturer and world headquarters of the Watec brand cameras; and

(3) in promotional brochures, Watec America represented to customers that Watec America and Watec Japan held the marks;

Based on the alleged representations that Watec Japan held the marks, Watec Japan claims it formed and made a substantial investment in Genwac to distribute Watec Japan-manufactured products in the U.S. Moreover, Watec Japan claims that Watec America never objected to Watec Japan's use of the marks until Watec Japan filed the instant lawsuit in October 2000.

Watec America claims that it never represented to Watec Japan that it would not assert its trademark rights against Watec Japan, and notes that Watec Japan has not identified any evidence that such a representation was ever made. To the contrary, Watec America maintains that it sent a cease-and-desist letter to Watec Japan complaining about Genwac's use of the WAT and WATEC marks prior to Watec Japan's filing of the instant lawsuit. Watec America maintains that there was not acquiescence in Watec Japan's

use of the WAT and WATEC marks prior to the formation of Genwac, because by Watec Japan's own theory any use of the marks was based on the parties' alleged distribution agreement whereby they were partners, rather than competitors. When they were acting as partners, there was no reason to object to the inclusion of references to Watec Japan in brochures and advertising for WAT and WATEC brand cameras and related products.

Because there are so many factual disputes remaining and because Watec America had little real motivation to object to Watec Japan's use of the WAT and WATEC marks prior to the parties' termination of their business relationship in 1999, laches by acquiescence/equitable estoppel/waiver cannot, as a matter of law, prevent Watec America from proceeding with its trademark counterclaims.

*(3) Watec Japan's affirmative defense of unclean hands*

Watec Japan also claims that Watec America's trademark counterclaims are barred by the doctrine of unclean hands based on Watec America's alleged fraud in federally registering the WAT and WATEC marks and subsequently obtaining incontestability status for them.

Watec Japan, however, cannot assert an unclean hands defense based upon its fraud allegations against Liu and his procurement of the federal trademarks. Although Watec Japan plead "unclean hands" as an affirmative defense in its Answer to Watec America's counterclaims, it is clear from Watec Japan's papers that its unclean hands defense is based on Liu's alleged fraud in registering the WAT and WATEC marks in Watec America's name and later obtaining incontestability for the marks. As discussed previously

in this Order at subsection II(3)(A)(2), Watec Japan failed to plead fraud in its Answer to Counterclaims and therefore cannot now assert it as the basis for an affirmative defense. Even assuming *arguendo* that Watec Japan could get around this bar by asserting its fraud allegations indirectly via its pleaded unclean hands defense, it would have had to have pleaded the fraud/unclean hands with "particularlity," as is required under Fed. R. Civ. Proc. 9(b). To allow Watec Japan to assert what is actually a defense of fraud without requiring it to do so with particularlity, simply because Watec Japan pleaded the defense under the label "unclean hands," would be inequitable and would directly frustrate the purpose of Rule 9(b). Because Watec Japan only states its affirmative defense of "unclean hands" in the most conclusory manner in its Answer, it cannot now assert its unclean hands defense insofar as it is based on Liu's alleged fraud.

Besides its fraud-based allegations, Watec Japan claims that Watec America's trademark counterclaims are barred by the unclean hands doctrine because Watec America has misrepresented to customers that it (Watec America) sells products manufactured by Watec Japan when, in fact, the products are actually manufactured by some other entity. Watec Japan alleges that Watec America engaged in this deceptive conduct after the parties' business relationship terminated some time in 1999. Watec Japan's complaint, however, is essentially that after the termination of the parties' business relationship, Watec America continued using the WAT and WATEC marks on cameras that were manufactured by entities other than Watec Japan.

But as discussed previously in this Order, Watec America may be the sole owner of the WAT and WATEC marks in the United States. Although the Court cannot so conclude at this time (because it is possible that Watec Japan retains certain state common law rights to the marks), if factual

disputes are settled in Watec America's favor at trial and it is found to be the sole owner of the marks, then it would have been completely within its rights to engage in the very conduct that Watec Japan claims was wrongful. Accordingly, the Court cannot conclude at this time that Watec America's trademark counterclaims are barred by its unclean hands in selling non-Watec Japan-manufactured products in the U.S. under the WAT and WATEC marks.

*(4) Watec Japan's fair use affirmative defense*

Finally, Watec Japan and Genwac maintain that they have a valid fair use defense which bars Watec America's trademark counterclaims as a matter of law. Watec Japan and Genwac assert that under the trademark fair use doctrine, it may properly use the name "Watec Co. Ltd." and the marks WATEC and WAT to describe their relationship and the origin of their products. They claim that because Watec Japan ("Watec Co. Ltd.") manufactures cameras and related products for Genwac, Genwac should be able to identify Watec Co. Ltd. as the manufacturer and source of the goods that it sells.

The trademark fair use defense is rooted in 15 U.S.C. §1115(b)(4), which provides that a valid defenses to infringement of an incontestable mark exists under the following conditions:

> (4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the

goods or services of such party, or their geographic origin...

15 U.S.C. §1115(b)(4). A defendant must prove three elements to establish a fair use defense:

(1) Defendant's use of the term is not as a trademark or service mark;

(2) Defendant uses the term "fairly and in good faith"; and

(3) Defendant uses the term "only to describe" its goods and services.

The Court is not satisfied that Watec Japan and Genwac has shown, as a matter of law, that it uses the terms "fairly and in good faith." If Genwac only referenced "Watec Co. Ltd." as the manufacturer of the goods it sells, then good faith might be beyond question. And if Genwac only referenced "Watec", "WATEC", and "WAT" to differentiate its products from those sold by Watec America, then Genwac's and Watec Japan's good faith might be unblemished. But Genwac admits that it also uses the mark "WATEC" as "shorthand" for "Watec Co. Ltd." It has used WATEC in advertising slogans such as "Genwac-Brand Watec Cameras" and "Same Quality Watec Cameras, Lower Pricing." The Court views such "shorthand" use with great suspicion, especially given that (1) WATEC is a trademark that lies at the core of the parties dispute and to which Watec America holds an incontestable federal trademark, and (2) the need for a shorthand phrase seems misplaced where the "longhand" is so short (Watec Co. Ltd.). At this stage, when so many factual disputes remain between the parties, the Court cannot conclude that Watec Japan's and Genwac's use of the mark "WATEC" is made in good faith, without any intent to trade upon or dilute the goodwill of Watec America.

Moreover, in the Ninth Circuit, fair use cannot be a defense where likelihood of confusion is proven. *See Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1248 (9th Cir. 1984) ("Relying on the district court's ruling on the so-called fair use defense, however, [defendant] invokes its fair use of

[plaintiff's] mark to immunize it from liability for infringement even where likelihood of confusion has been shown. This court has never adopted so broad an interpretation of the fair use defense, and we decline to do so here."). *See also McCarthy* at §11:47 ("...it is inconsistent to find both likely confusion and a fair use."). Therefore, if Watec Japan and Genwac wish to establish their fair use defense at the summary judgment stage, they must show as a matter of law that there is no likelihood of confusion among consumers regarding Genwac and Watec America's products. Watec Japan and Genwac cannot do this.

The Ninth Circuit uses a multi-factor test for assessing likelihood of consumer confusion in trademark infringement actions; those factors include: (1) strength of mark, (2) proximity of goods, (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of the expansion of product lines. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). *see also Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993); *Gallo*, 967 F.2d at 1290. And most relevant to the present analysis, "likelihood of confusion is a mixed question of law and fact that is predominantly factual in nature." *E.&J. Gallo Winery*, 967 F.2d at 1290. In the instant lawsuit, numerous factual disputes remain between the parties that preclude the Court from finding as a matter of law that there is no likelihood of confusion. Actually, it appears that based on the undisputed facts of this case, at least three of factors tip sharply in favor of there being a likelihood of confusion (proximity of goods, marketing channels used, and likelihood of expansion of product lines). Moreover, if factual disputes are resolved in favor of Watec America, then a number of other factors will argue in favor of there being a likelihood of confusion

(strength of mark, similarity of the marks, defendant's intent in selecting and using the mark, and perhaps actual confusion). Under these circumstances, the Court cannot conclude as a matter of law that there is no likelihood of confusion that will occur as a result of Watec Japan's and Genwac's alleged "fair use" of the WATEC and WAT marks in describing the origin of the goods sold by Genwac. Accordingly, summary adjudication of Watec America's trademark claims based on Watec Japan's and Genwac's fair use defense is inappropriate.

*(2) Watec America's libel counterclaim*

*A. Factual and legal background*

Watec America and Liu's libel claim is based on the following statements contained in an advisory notice issued by Watec Japan and Genwac and published in a trade journal publication:

> To Our Valued Customers,
>
> Watec Co. Ltd., the original designer and manufacturer of the Watec camera line entered into an agreement in 1990 with Mr. C.L. Liu to have him distribute products in the United States. Pursuant to this agreement, Mr. Liu formed Watec America Corp. and registered the name "Watec" under Watec America Corp. However, due to serious violations of the agreement by Mr. Liu, Watec Co. Ltd. has terminated its relationship with Watec America Corp.
>
> Please be advised that Watec Co. Ltd. no longer distributes its

products through Watec America Corp; and Watec America is not authorized to represent such. Below are the products which carry the "Watec" brand, but are NOT manufactured by Watec Co., Ltd. Watec Co., Ltd. hereby disclaims any liability for items that are sold by Watec America Corp., including but not limited to the items below:

a) 'LCL' Model Cameras b) WAT-660-60A c) WAT-660-37A
d) WAT-902C e) WAT-902HS

To prevent confusion during the legal dispute between Watec Co., Ltd. and Watec America Corp., we have established a subsidiary, GENWAC, Inc. in the United States. Products manufactured by Watec Co., Ltd. are currently only distributed through GENWAC, Inc.

*See* Exhibit 10.

The California Civil Code defines defamation as being effectuated by either libel or slander. *See Cal. Civ.Code* §44. The Civil Code defines libel as "a false and unprivileged publication by writing, printing . . . or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, . . . or which has a tendency to injure him in his occupation." *Cal. Civ.Code* §45.

*B. Libel per se*[20]

"Under California Civil Code §45a, a plaintiff may only prevail on a claim for libel if the publication is libelous on its face or if special damages have been proven." *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 694 (9th Cir. 1998). A statement is considered "libelous on its face" if it is "defamatory on the plaintiff without the necessity of explanatory matter." *Cal Civ. Code* §45a. "But if it is *covert* defamation, i.e., if the defamatory character is not apparent on its face and requires an explanation of the surrounding circumstances (the 'innuendo') to make its meaning clear, it is not libelous per se, and *is not actionable without pleading and proof of special damages*." 5 WITKIN, SUMMARY OF CALIFORNIA LAW, Torts §481 (1988 5th ed.). A statement that the plaintiff "has been guilty of an act of dishonesty" is a classic example of libel per se. *Id.* "It is not necessary that the publication charge the commission of a crime; it is sufficient if it so reflects upon the person's integrity as to bring him into disrepute." *Id.*

Watec America maintains that it need not show special damages because the statements in Watec Japan's libelous advisory notice are libelous per se: they impute fraud, dishonesty, and questionable business methods to Watec America and Liu. Watec America claims that the advisory notice does not merely say that Liu breached the parties' agreement, but instead states that there was some deeper and longer relationship of trust between the parties that Liu "seriously violated," impliedly by fraud, dishonesty, or questionable business methods.

Besides claiming that Watec Japan's advisory notice cast aspersions on

---

[20] Watec America and Liu have not attempted to show special damages. Instead, their papers indicate that they are prosecuting their libel claim solely on the grounds that the advisory notice contained statements that were libelous per se.

the honesty and integrity of Liu, Watec America alleges that the notice implied that Watec America was dealing in counterfeit merchandise. According to Watec America, because the notice stated that Watec America was no longer authorized to sell Watec Japan cameras and then listed five WATEC brand camera models that were not authorized, i.e. that carry the WATEC brand but are not manufactured by Watec Japan, it was implied that Watec America was carrying a false brand and/or dealing in counterfeit cameras.

This second libel allegation, based on an alleged implication that Watec America sells counterfeit goods, is raised by Watec America for the first time in its Opposition to Watec Japan's Motion for summary judgment of counterclaims. Watec Japan's Interrogatories, #3, asked Watec America and Liu to "state all claims on which WATEC AMERICA bases its second counterclaim in the COUNTERCLAIM that PLAINTFF libeled WATEC AMERICA and Chia L. Liu." In response, Watec America and Liu replied that "In paid advertisements published in at least two trade magazines Plaintiff accused Dr. Chia Liu of 'serious violations' of agreements with Plaintiff thereby attributing the characteristic of dishonesty and untrustworthiness in business to Dr. Liu personally and to Watec America Corp. through such libel directed at its president and dealings of the company." Exhibit 157.[21] Watec America and Liu cannot now assert this second libel allegation for the first time in light of their response to the Interrogatory. Accordingly, the Court will only consider the statement concerning "serious violations of the agreement by Mr. Liu."

"The determination as to whether a publication is libelous on its face

---

[21]No mention is made in Watec America's Motion for summary judgment of its counterclaims of the advisory notice insinuating that Watec America sells counterfeit goods.

is one of law, and is to be measured by the effect the publication would have on the mind of the average reader." *Newcombe*, 157 F.3d at 696.

Watec Japan goes to considerable lengths in its papers to characterize its advisory notice as alleging that Liu and Watec America committed a mere breach of contract. According to Watec Japan, no stigma attaches to a mere breach of contract. Watec Japan did not, however, simply allege that Watec America and Liu committed a mere breach of contract. The advisory notice first mentions that Watec Japan and Watec America entered into an agreement in 1990; as the advisory notice was published in 2000, this means that the parties had a long-term business relationship prior to the disagreement. Next, the notice states not that Watec America and Liu merely "breached" the agreement, but that they committed "serious violations of the agreement." These violations were serious enough that Watec Japan "terminated its relationship with Watec America Corp."

A "serious violation" of a business agreement that causes a company to terminate a long-term business relationship does not imply a mere breach of contract or "reasonable-minds-can-differ" commercial dispute. The average reader of the advisory notice might likely conclude that Watec America and Liu had been unethical or dishonest in their business dealings with Watec Japan. That average reader might then reasonably decide to avoid doing business in the future with Watec America and Liu, because they commit serious violations of business agreements with long-time business partners and are untrustworthy.

The Court finds that the advisory notice's statements regarding the "serious" violations of the parties' agreement is libelous per se.

*C. Opinion or statement of fact*

Watec Japan asserts that its advisory notice's mention of Liu's "serious violation of the agreement" was merely expressing a non-actionable opinion that Liu had breached his alleged oral agreement that Watec America would distribute only Watec Japan products. Watec Japan denies that it made an actionable statement or implication of fact that is demonstrably true or false.

"Pure opinions -- 'those that do not imply facts capable of being proved true or false' – are protected by the First Amendment." *Nicosia v. De Rooy*, 72 F.Supp.2d 1093, 1101 (N.D. Cal. 1999) (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1153 fn. 10 (9th Cir. 1995). "Whether a statement is an assertion of fact or opinion is a question of law for the court." *Nicosia*, 72 F.Supp.2d at 1101; *see also Baker v. Los Angeles Herald Examiner*, 42 Cal.3d 254, 260 (1986). And "the threshold question in defamation suits is not whether a statement might be labeled 'opinion,' but rather whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact." *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990) (internal quotations and citations omitted). To make such a determination, the Ninth Circuit employs the following analysis:

> [W]e examine the totality of the circumstances in which [the statement] was made. First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statement, the setting, and the format of the work. Next we turn to the specific context and content of the statement, analyzing the extent of the figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995).

First, although only the allegation of "serious violations" against Liu and Watec America is actionable, the entire advisory notice gives the impression that Liu and Watec America (1) are untrustworthy , (2) have seriously wronged Watec Japan, and (3) might even try to misrepresent the source of the goods that it sells.

Second, looking at the advisory notice in its specific context, it was published in a trade publication circulated to dealers and other potential customers of Watec America and Genwac. Although Watec Japan contends that in this competitive context readers would expect it to use "strong language," the Court thinks that extra care should have been taken in making serious accusations against Watec America and Liu because Watec Japan knew that actual and potential customers would be reading the notice. In business, a company's or an executive's good reputation is invaluable and, once damaged, often not easily repaired. To cast aspersions on someone's reputation in a business trade publication jeopardizes that person's or company's business prospects. The risk of harm to Watec America and Liu was heightened. Therefore, the average reader would expect that any accusations that imply dishonesty or questionable business tactics are well-grounded.

Finally, Accusing someone of violating an agreement supposes that there is an objective standard, i.e. the agreement itself, that can be referenced in order to demonstrate that the accused breached one or more of its terms. Watec Japan's statement that Liu committed "serious violations" does not indicate merely that the parties had differences that they could not resolve and Watec Japan felt it was in the right. It did not say that the parties have severed their relationship and that legal actions are pending. Instead, it implies that there was an agreement between the parties with specific terms and that, objectively speaking, Liu and Watec America breached that

agreement. The statement is capable of being shown to be provably false.

Watec Japan points to the Ninth Circuit's decision in *Partington v. Bugliosi*, 56 F.3d 1147, (9th Cir. 1995) in support of its contention that it was merely expressing an opinion. In *Partington*, the Court of Appeals observed:

> The courts of appeals that have considered defamation claims ... have consistently held that when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment. As the Fourth Circuit noted, "[b]ecause the bases for the ... conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related." Chapin, 993 F.2d at 1087. Similarly, the District of Columbia Circuit has noted that " '[b]ecause the readers understand that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation.' " Moldea II, 22 F.3d at 317 (citing Moldea v. New York Times Co., 15 F.3d 1137 (D.C.Cir.1994), Moldea I ). Finally, the First Circuit has held that, as long as the author presents the factual basis for his statement, it can only be read as his "personal conclusion about the information presented, not as a statement of fact." Phantom Touring, Inc., 953 F.2d at 730 (emphasis added) ... we join with the other courts of appeals in concluding that when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.

*Id.* at 1156-57. Far from supporting Watec Japan's contention that the statement in its advisory notice was merely an opinion, the Ninth Circuit's

conclusion in *Partington* actually further demonstrates why the statement is an implied assertion of objective fact. The advisory notice accuses Watec America and Liu of "serious violations of the [alleged distribution] agreement." The advisory notice does not even mention what terms of that agreement were breached, let alone provide the sort of background facts present in *Partington*. Under these circumstances, it is absolutely not clear that Watec Japan is merely representing its own "interpretations" of the contractual language and Watec America's and Liu's actions. Furthermore, Watec Japan's conclusory and (at least in the advisory notice) factually unsupported allegation of "serious violations of the agreement" is particularly cavalier and misleading given that the "agreement" is not written but instead is based on disputed promises and understandings reached back in 1990.

The Court finds that Watec Japan's statement that Liu committed serious violations of an agreement between Watec Japan and Watec America is a potentially actionable statement of fact, not a mere non-actionable statement of opinion.

*D. Standard of Culpability*

The parties dispute whether or not the advisory notice should be analyzed under the "private person" libel standard or the more demanding "public figure" standard.

Watec America and Liu contend that they are private persons and that the advisory notice is a matter of private, not public, concern. Watec Japan does not address this contention in any depth, but instead dismisses it as

evidence that "Watec America either misunderstands the law of defamation or is intentionally attempting to misstate the applicable standard in the hope of avoiding summary judgment." (Watec Japan Reply at 10:16-18). By making such accusations, it appears that Watec Japan maintains that Watec America and Liu are public figures or the speech at issue is of public concern, although Watec Japan offer absolutely no evidence in support of those conclusions.

As the U.S. Supreme Court explained in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974), a party may be considered a public figure "on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." *Id.*

Neither Watec America nor Liu are neither "public figures for all purposes" nor "limited purpose public figures" who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* at 352. The controversy between Watec America and Watec Japan is not a "public question" or a "public controversy." Rather, it is a private dispute that is of little or no interest to anyone but the parties themselves and a narrow class of consumers interested in the products sold by the parties. As was the case in *Dun & Bradstreet, Inc. v. Greenmoss Builders*, 472 U.S. 749, 762 (1985), the advisory notice was "speech solely in the individual interest of the speaker and its specific business audience." *Id.* It is not of public concern.[22]

---

[22]Even though Watec America and Liu are private persons, if the speech were of public

Because Watec America and Liu are private persons and the advisory notice is not a matter of public concern, Watec America and Liu need not show that Watec Japan acted with actual malice in order to obtain either actual, presumed, or punitive damages. *Id.* However, they do need to show that Watec Japan acted negligently in making those statements. *See Gertz*, 418 U.S. at 347 ("We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."); *Philadelphia Newspapers*, 475 U.S. at 778; *but see Dun & Bradstreet*, 472 U.S. at 773-74 (Justice White, concurring); *see also Brown v. Kelly Broadcasting Co.*, 48 Cal.3d 711, 742; *Newcombe*, 157 F.3d at 694 n.4 ("A private person who is allegedly defamed concerning a matter that is not of public concern need only prove, in addition to the requirements set out by the local jurisdiction, that the defamation was due to the negilgence of the defendant."). At this point, the Court cannot conclude that Watec Japan acted negligently in making the statement in its advisory notice because the parties have a bona fide factual dispute concerning (1) whether the parties reached an oral agreement in 1990 regarding Watec America's distribution of exclusively Watec Japan products; and (2) whether Watec America and Liu seriously violated any terms of such an agreement. The parties' failure to put the terms of any 1990 distribution agreement in writing, and their conflicting testimony regarding any such agreement today make it impossible to determine as a matter of law whether Liu committed any "serious violations." But if Watec Japan convinces the trier of fact at trial that the answers to those two questions are both "yes,"then Watec Japan

---

concern then they would bear the burden of proving its falsity at trial. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986).

could hardly be said to have acted negligently.

*E. Truth or Falsity of the statements*

A private person plaintiff need not prove that the defamatory statement is false when it relates to a matter of private concern; the law presumes that defamatory speech is false so long as the speech does not concern public officials or figures or matters of public concern. *See Dun & Bradstreet*, 472 U.S. at 760-61; *Brown v. Kelly Broad Co.*, 48 Cal.3d 711, 753 n.37 (1989); 5 Witkin's Summary of California Law at §496 ("It was formerly held in California that the plaintiff was required to allege falsity of the statements, but it is now recognized that the burdens of pleading and of proof of truth are both on the defendant."). Truth is a complete defense to such libel, but the burden is on the defendant to show that the defamatory statement is true. *See Brown v. Kelly Broad*, 48 Cal.3d at 753 n.37;Witkin's at §494.

Whether or not Watec Japan's statements are true or false is unanswerable at this time. As with the issue of negligence, two central questions exist: (1) did parties reached an oral agreement in 1990 regarding Watec America's distribution of exclusively Watec Japan products; and (2) did Watec America and Liu breached any terms of such an agreement. Because factual disputes prevent the Court from answering either question at this time, we cannot conclude whether Watec Japan's statements in its advisory notice are true and therefore not actionable.

Summary adjudication of the libel claim in favor of either Watec Japan or Watec America and Liu is inappropriate at this time.

## III. Conclusion

The Court hereby (1) **DENIES** Defendant Watec America's Motion for summary adjudication of Plaintiff Watec Japan's claims (Docket #41); (2) **DENIES** Defendant-counterclaimant Watec America's Motion for summary judgment of its counterclaims (Docket #37); and (3) **DENIES** Defendant Plaintiff-counterclaim Defendant Watec Japan's Motion for summary judgment of the counterclaims (Docket #49).

March 8, 2002.

FLORENCE-MARIE COOPER, JUDGE
UNITED STATES DISTRICT COURT